1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

THOMAS AVINA, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

CASE NO.08-CV-1302W (WMC)

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. 23]**

Thomas Avina, Rosalie Avina, and their two minor daughters B.F. Avina and B.S. Avina (collectively "Plaintiffs") commenced this action against United States of America ("Defendant") for assault and battery, and intentional infliction of emotional distress after Drug Enforcement Agency ("DEA") agents executed search and arrest warrants on Plaintiffs' incorrectly identified home.  Defendant seeks summary judgment, and Plaintiffs oppose.

The Court decides the matter on the papers submitted and without oral argument.  See Civ. Local R. 7.1(d.1).  For the reasons stated below, the Court **GRANTS** Defendant's motion (Doc. 23).

## I.   BACKGROUND[1]

On January 19, 2007, the DEA obtained a search warrant authorizing entry into Plaintiffs' home at 1601 Drew Road, Space 14, Seeley, California, to seek evidence of illegal drug-trafficking, including "[w]eapons, firearms, firearm accessories, and ammunition" (*Search Warrant Ex. F*, Attach. B ¶ 3 [Doc. 23-3].)[2] DEA agents planned to concurrently execute a search warrant on the home and an arrest warrant for Luis Eduardo Alvarez, a suspected drug-trafficker with a history of violence and resisting arrest, who was believed to be at the search address. (*Operational Plan Ex. G*, at 41-42 [Doc. 23-3].) Thus, in order to minimize the possibility of violence and injury, the DEA sent a search team of seven armed agents to move rapidly through the home and assert control over the occupants. (*Id.* at 42.)

On the morning of January 20, 2007, agents executed the search warrant and entered Plaintiffs' home. (*Search Warrant Return Ex. F* [Doc. 23-3].) Before the agents entered, Rosalie Avina was sleeping on the couch. (*Rosalie Avina Dep. Ex. J*, at 9:9-10 [Doc. 23-3].) She heard a loud pounding that woke her. (*Id.* at 9:10-13.) Then the agents knocked on the door and announced that they are "police." (*Id.* at 9:18-21.) When Rosalie Avina got up to answer the door, it swung open and the agents entered Plaintiffs' home. (*Id.* at 19:21-22.) She then "froze." (*Id.* at 9:24-10:-2.) She complied when the agents commanded her to get down on the floor, and they subsequently handcuffed her. (*Id.* at 10:3-7.) During the entry, the agents' commands to Rosalie Avina included profanity. (*Id.* at 10:3-4.)

After retreating into the bedroom from the living room as the agents entered the home, Thomas Avina opened the bedroom door to an agent with a shotgun pointed at

---

[1] Exhibits designated with a number refer to Plaintiffs' exhibits, and those identified by a letter refer to Defendant's exhibits.

[2] The DEA developed their information through an investigation and court-authorized wire intercepts. (*Report of Investigation Ex. 8*, at 1-3, May, 30, 2006 [Doc. 31].)

1  his face.  (*Thomas Avina Dep. Ex. H*, at 11:8-10, 11:23-25 [Doc. 23-3].)  The agents
2  commanded Thomas Avina to "[g]et down on the ground."  (*Id.* at 11:10.)  However,
3  he did not comply.  (*Id.* at 11:12-22.)  Instead, he questioned the agents and told them
4  that they are "making a mistake."  (*Id.* at 11:12-13, 11:17-18.)  In response, the agents
5  forced Thomas Avina to the ground and handcuffed him.  (*Id.* at 11:19-22, 12:4-7.)
6  The agents' commands to Thomas Avina also included profanity.  (*Id.* at 11:16, 12:6.)

7       Once the agents secured Rosalie and Thomas Avina, they entered B.F. Avina's
8  and B.S. Avina's rooms.  (*Rosalie Avina Dep. Ex. J*, at 10:7-10.)  When the agents
9  entered B.F. Avina's room, she was already awake lying on her bed.  (*B.F. Avina Dep.
10  Ex. K*, at 7:25-8:3 [Doc. 23-3].)  After the agents commanded her to get down on the
11  ground, she complied.  (*Id.*)  B.F. Avina, who was fourteen at the time, rolled off her bed
12  onto the floor and the agents handcuffed her.  (*Id.* at 7:6, 8:4-7).  B.S. Avina, who was
13  eleven at the time, was sleeping when the agents entered her room.  (*B.S. Avina Dep.
14  Ex. L*, at 7:19-25, 8:18 [Doc. 23-3].)  As they entered her room, the agents also
15  commanded her to get down on the ground.  (*Id.* at 8:3.)  However, she did not comply
16  and instead retorted, "Are you serious.  What did I do?"  (*Id.* at 8:4-7.)  The agents then
17  pulled her to the floor and handcuffed her.  (*Id.* at 8:7-10.)

18       Eventually, Plaintiffs were all brought into the living room in handcuffs and
19  placed on the couch, except for Thomas Avina, who remained on the floor.  (*Thomas
20  Avina Dep. Ex H*, at 13:5-11; *B.F. Avina Dep. Ex. K*, at 8:7-10; *B.S. Avina Dep. Ex. L*, at
21  9:3-7.)  The search took no more than one hour, and the agents removed all handcuffs
22  on Plaintiffs about five to twenty minutes before the completion of the search.  (*Thomas
23  Avina Dep. Ex. H*, at 20:12-17, 25:6-11, 29:1-7.)  Before the agents left, Special Agent
24  Matthew Lankenau, the team leader, gave Plaintiffs claims-processing information and
25  claims-contact information.  (*Lankenau Decl. Ex. E*, at 3:28-4:3, 7:5-7 [Doc. 23-3].)
26  Also, throughout the search, no one requested any medical attention.  (*Id.* at 7:2-4.)
27  Plaintiffs visited a nearby clinic after the search (*B.S. Avina*

28

1    *Dep. Ex. L*, at 18:23-24), but no reports of physical injuries or complaints of injuries were

2    recorded (*Avina Family Medical Records Ex. I* [Doc 23-3]).  The medical records of all

3    four Plaintiffs state "diagnosis: anxiety-nonspecific;" they were given unknown non-

4    prescriptions pills to take in order to relax.  (*Id.*)  Afterwards, Plaintiffs did not go to any

5    follow-up appointments.  (*Rosalie Avina Dep. Ex. J*, at 27:23-28:4.)  Other than some

6    minor bruises from the handcuffs, no one suffered any permanent physical injuries.

7    (*Thomas Avina Dep. Ex. H*, at 9:15-19 (characterizing his current general health as good

8    and "100"), 27:13-19; *Rosalie Avina Dep. Ex. J*, at 19:1-13, 27:23-25, 28:1-4; *B.F. Avina

9    Dep. Ex. K*, at 11:9-25, 12:1-6; *B.S. Avina Dep. Ex. L*, at 18:15-25, 19:1-25.)  The agents

10   established control, completed their search, and departed without permanent physical

11   injury to anyone.[3]

12         On July 21, 2008, Plaintiffs filed this lawsuit.  (Doc. 1.)  The Complaint asserts

13   a cause of action for assault and battery,[4] and intentional infliction of emotional distress

14   against Defendant.  On April 15, 2010, Defendant filed this motion for summary

15   judgment.  (Doc. 23.)  Plaintiffs filed their opposition to Defendant's motion on June

16   15, 2010.  (Doc. 26.)  On June 22, 2010, Defendant filed its reply.  (Doc. 33.)

17

18   **II.   LEGAL STANDARD**

19         Summary judgment is appropriate under Rule 56(c) where the moving party

20   demonstrates the absence of a genuine issue of material fact and entitlement to

21

---

22         [3] Upon completion of the search, Luis Alvarez was not found and no evidence was
23   seized.  (*Search Warrant Return Ex. F*.)  It turns out that the DEA made an "inadvertent error"
     identifying Alvarez's residence during the preparation of the warrant.  This error was made "as
24   Alvarez' BMW was seen meeting with the driver of a black Honda which was registered to
     1601 Drew Road, Space 14, Seeley, California."  (*Id.*)
25

26         [4] Plaintiffs allege "assault and battery" as a single cause of action.  However, "the term
27   *assault and battery* is frequently used when a battery has been committed . . . ."  <u>Black's Law
     Dictionary</u> (9th ed. 2009).  As such, the Court will address Plaintiffs' assault-and-battery cause
28   of action as one for battery.

judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Freeman v. Arpaio</u>, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  <u>Id.</u> at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."  <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact."  <u>Keenan v. Allen</u>, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing <u>Richards v. Combined Ins. Co. of Am.</u>, 55 F.3d 247, 251 (7th Cir. 1995)).  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 159-60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts."  <u>Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th

1   Cir. 1995) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 242, 252 (1986) ("The

2   mere existence of a scintilla of evidence in support of the nonmoving party's position is

3   not sufficient.").  Rather, the nonmoving party must "go beyond the pleadings" and by

4   "the depositions, answers to interrogatories, and admissions on file," designate "specific

5   facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting

6   Fed. R. Civ. P. 56(e)).

7          When making this determination, the court must view all inferences drawn from

8   the underlying facts in the light most favorable to the nonmoving party.   <u>See</u>

9   <u>Matsushita</u>, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and

10   the drawing of legitimate inferences from the facts are jury functions, not those of a

11   judge, [when] he [or she] is ruling on a motion for summary judgment." <u>Anderson</u>, 477

12   U.S. at 255.

13

14   **III.   DISCUSSION**

15          Plaintiffs assert two tort causes of action: assault and battery, and intentional

16   infliction of emotional distress.[5]  (*Compl.* ¶¶ 10-16 [Doc. 1].)  Under the Federal Torts

17   Claims Act, the Court applies the law of the state in which the alleged tortious conduct

18   occurred.  28 U.S.C. § 2671; <u>Richards v. United States</u>, 369 U.S. 1, 7 (1962).  Thus, the

19   Court adheres to the appropriate California tort laws in this case.

20

21

22

23          [5] In their opposition, Plaintiffs cite case law relevant to a civil-rights claim, and contend

24   that agents acted negligently during their entry into Plaintiffs' home. (*Pls.' Opp'n to Def.'s Mot.*
     *Summ. J.* 5:11-14, 6:13-15 [Doc. 26].)  However, Plaintiffs have neither asserted a civil-rights

25   nor negligence claim.  As such neither is an issue before the Court.  Furthermore, Plaintiffs
     suggest that the agents' alleged negligence raises a genuine issue of material fact with respect

26   to the assault-and-battery issue. (*Id.* at 6:13-15.)  However, negligence is unrelated to assault

27   and battery because it is not an element of assault and battery.  Therefore, Plaintiffs failed to
     meet their burden to establish a genuine issue of material fact. <u>See</u> <u>Celotex</u>, 477 U.S. at 322-

28   23.

1    **A.    DEA Agents Used Objectively Reasonable Force In Light of**

2    **Anticipating An Inherently Dangerous Situation.**

3    Under California law, a plaintiff who brings an assault-and-battery action against

4    a law-enforcement officer has the burden of proving unreasonable force[6] as an element

5    of the tort.  Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1272 (Cal. Ct. App.

6    1998); see also Brown v. Ransweiler, 171 Cal. App. 4th 516, 527 (Cal. Ct. App. 2009)

7    ("A state law battery is a counterpart to a federal claim of excessive use of force.  In

8    both, a plaintiff must prove that the peace officer's use of force was unreasonable.").

9    Although the reasonableness of force used is ordinarily a question of fact for the jury,

10   a defendant can still win on summary judgment if the district court concludes that the

11   use of force was objectively reasonable under the circumstances.  Liston v. Cnty. of

12   Riverside, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (citing Scott v. Henrich, 39 F.3d 912,

13   915 (9th Cir. 1994)).  The "reasonableness of a particular use of force is judged from the

14   perspective of a reasonable officer on the scene, not by 20/20 vision of hindsight."  In

15   re Joseph F., 85 Cal. App. 4th 975, 989 (Cal. Ct. App. 2000).  As such, the inquiry is

16   an objective one: was the officer's action objectively reasonable in light of the facts and

17   circumstances confronting him, without regard to his underlying intent or motivation.

18   Graham, 490 U.S. at 397; see also Muehler v. Mena, 544 U.S. 93, 99-100 (2005).

19   In Meuhler, officers sought dangerous weapons and anticipated the presence of

20   a wanted gang member believed to be armed and dangerous during the execution of a

21   search warrant.  544 U.S. 95-96, 100.  Instead, an eight-member Special Weapons and

22   Tactics (SWAT) team clad in helmets and black vests entered Iris Mena's bedroom

23   while she slept, woke her at gunpoint, and placed her in handcuffs.  Id. at 96, 107.  The

24

---

25   [6] "Claims that police officers used excessive force in the course of an arrest, investigatory

26   stop or other 'seizure' . . . are analyzed under the reasonableness standard of the Fourth
     Amendment of the United States Constitution."  Munoz v. City of Union City, 120 Cal. App.

27   4th 1077, 1102 (Cal. Ct. App. 2004) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)).

28   "Reasonableness" used throughout this order refers to this standard.

SWAT team also handcuffed three other individuals found on the property, and took them, along with Mena, into a converted garage. Id. at 96. As the officers conducted their search, Mena and the other occupants were detained for three hours in handcuffs. Id. at 96, 100. The Supreme Court held that the officers' use of force to effectuate Mena's three-hour detention was reasonable given that the warrant sought weapons and evidence of gang membership. Id. at 99-100.

"The execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence and frantic efforts to conceal or destroy evidence[.]" Michigan v. Summers, 452 U.S. 692, 702 (1981). "[T]he risk of harm to both the police and occupants is minimized if the officers routinely exercise unquestioned command of the situation." Id. Therefore, "[w]hen officers undertake a dangerous assignment to execute a warrant to search property that is presumably occupied by violence-prone [suspects], it may well be appropriate to use both overwhelming force and surprise in order to secure the premises as promptly as possible." Muehler, 544 U.S. at 108 (Kennedy, J., concurring). Accordingly, governmental interests in detaining and using force are at their maximum when a warrant authorizes a search that may expose officers to an inherently dangerous situation. See id. at 100 (implying that the search for weapons and a wanted gang member believed to reside at the premises creates an inherently dangerous situation).

In this case, DEA agents anticipated an inherently dangerous situation. Foremost, the agents sought evidence of illegal drug-trafficking which is a "dangerous [and] violent business." United States v. Mierss-Vazquez, 983 F.2d 1079, 1993 WL 7246, at *1 (9th Cir. 1993) (unpublished table decision); accord Summers, 452 U.S. at 702. Special Agent Lankenau and Defendant's use-of-force expert, retired FBI Supervisory Agent Urey Patrick, have stated that the illegal drug trade is characterized by a prevalence of firearms and a propensity for violence. (Lankenau Decl. Ex. E, at 4:7-
//

-8-

14; *Urey Patrick Analysis & Report Ex. D*, at 3 [Doc. 23-3].)  Their opinions are consistent with the evidence sought, which included weapons, firearms, firearm accessories and ammunition.  (*Search Warrant Ex. F*, Attach. B ¶ 3.)  Moreover, the agents entered the home to arrest a suspected drug-trafficker with a history of violence, including resisting arrest, assault with a deadly weapon, and battery.  (*Lankenau Decl. Ex. E*, at 4:15-17.)  In light of the anticipated dangers, Special Agent Lankenau took the appropriate measures to minimize the risk of harm with a plan that used a team of seven agents to rapidly move through the home and assert control over the occupants.  (*Operational Plan Ex. G*, at 41-42.)  Additional contingencies included further local law-enforcement assistance for perimeter security and for immediate support, and notifying and identifying the nearest trauma centers.  (*Lankenau Decl. Ex. E*, at 4:18-25; *Operational Plan Ex. G*, at 42.)  Thus, anticipating an inherently dangerous situation, Special Agent Lankenau thoughtfully planned for his team to use reasonable and appropriate force during the execution of the search and arrest warrants.

During the execution of the warrants, DEA agents successfully carried out the operational plan through the reasonable use of force during the entry and search of Plaintiffs' home.  After knocking on the front door and announcing that they are the police, the agents quickly entered and handcuffed Rosalie Avina.  (*Rosalie Avina Dep. Ex. J*, at 10:3-7.)  Thomas Avina, however, was not compliant.  (*Thomas Avina Dep. Ex. H*, at 11:12-22.)  Thus, the agents reasonably forced Thomas Avina to the ground in order to handcuff him.  (*See id.* at 11:19-22, 12:4-7.)  The agents also handcuffed both daughters, but unhandcuffed them after learning their ages about three-fourths of the way through the search.  (*Rosalie Avina Dep. Ex. J*, at 15:3-11.)  Thomas and Rosalie Avina were unhandcuffed shortly thereafter.  (*Thomas Avina Dep. Ex. H*, at 28:22-29:7.)  Plaintiffs did not testify that they were hit in any way by the agents.  Based on Plaintiffs' deposition testimonies, the only force applied by the agents was associated solely with handcuffing Plaintiffs during entry to secure the home.  Furthermore, it is

08cv1302

an undisputed fact that the only physical injuries sustained by Plaintiffs were bruises on the wrists associated with the handcuffs.  (*Rosalie Avina Dep. Ex. J*, at 27:23-28:4; *Thomas Avina Dep. Ex. H*, at 19:16-18 ("[T]hey didn't physically slap me in the face – I felt like they had mentally slapped me in the face . . . ."); 27:13-19.)  Therefore, the agents' use of force in the form of handcuffing to effectuate detention was clearly reasonable given the anticipated danger.  See <u>Muehler</u>, 544 U.S. at 99-100 (citing <u>Summers</u>, 452 U.S. at 701-03).

Plaintiffs also argue that the allegedly extensive use of profanity somehow contributes to a finding that the agents used unreasonable force.  (*Pls.' Opp'n* 9:19-21.)  However, there is no evidence that suggests any use of profanity was extensive.  Thomas Avina testified that the agents used profanity when they commanded him to get on the ground and to not move.  (*Thomas Avina Dep. Ex. H*, at 11:16, 12:6.)  Rosalie Avina also testified that an agent used profanity when commanding her to get down on the ground.  (*Rosalie Avina Dep. Ex. J*, at 10:12-13.)  Though B.F. Avina testified that she heard profanity used in the background during the agents' entry (*B.F. Avina Dep. Ex. K*, at 7:25-8:3), neither B.F. nor B.A. Avina testified that any of the agents used any profanity directed at them.   Contrary to Plaintiffs' contention, the evidence demonstrates that the agents sparsely used profanity.  And during the few instances the agents used profanity, they did so only in association with commands during entry directed solely at the adults.  Furthermore, there is also no evidence that indicates the agents used profanity at all during the detention as they searched the home.  Accordingly, the Court rejects Plaintiffs' argument.

Though the execution of the search and arrest warrants on Plaintiffs' home was unfortunate, based on the undisputed facts—particularly, the minimal amount of force used throughout the search relative to the inherently dangerous circumstances confronting the agents—the Court finds that the DEA agents used objectively reasonable force in executing the search and arrest warrants at Plaintiffs' incorrectly identified home.

08cv1302

1    **B.      DEA Agents Did Not Engage in Extreme and Outrageous Conduct.**

2          To establish a cause of action for intentional infliction of emotional distress in

3    California, Plaintiffs must prove that Defendant engaged in extreme and outrageous

4    conduct with the intention of causing, or reckless disregard of the probability of causing,

5    emotional distress.  Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1001 (Cal.

6    1993).  For conduct to be outrageous, it must be "so extreme in degree, as to go beyond

7    all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

8    in civilized community."  Cochran v. Cochran, 65 Cal. App. 4th 488, 496 (Cal. Ct. App.

9    1998); accord Potter, 6 Cal. 4th at 1001 ("[Outrageous] conduct must be so extreme

10   as to exceed all bounds of that usually tolerated by civilized society.").  Further, "the tort

11   does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or

12   other trivialities."   Cochran, 65 Cal. App. 4th at 496 (internal quotation marks

13   omitted).

14         In this case, the Court has already determined that the DEA agents' use of force

15   was objectively reasonable.  According to Muehler, brandishing firearms and applying

16   handcuffs while executing a warrant—even on the wrong premises—is objectively

17   reasonable conduct given the inherently dangerous conditions confronting the law-

18   enforcement agents.  544 U.S. at 99-100.  Thus, to say that the DEA agents' actions

19   were extreme and outrageous to the point that it exceeded all bounds of that usually

20   tolerated by civilized society would clearly be antithetical to the Supreme Court's

21   holding in Muehler—objectively reasonably conduct is neither extreme nor outrageous.

22   See Muehler, 544 U.S. at 99-100; Cochran, 65 Cal. App. 4th at 496.  Therefore, the

23   DEA agents' conduct during the execution of the search and arrest warrants at

24   Plaintiffs' home was neither extreme nor outrageous.

25   //

26   //

27   //

28

08cv1302

1    IV.    C<small>ONCLUSION</small>

2           For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary

3    judgment.  (Doc. 23.)

4

5           **IT IS SO ORDERED.**

6

7    DATED:  November 1, 2010

8                                                    _____

9                                                    Hon. Thomas J. Whelan
                                                     United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

08cv1302